**Anthony DeSANTIS, Plaintiff,**

v.

**Thomas RICCI, Peter Torro, John Does, and New Jersey Sports and Exposition Authority, Defendants.**

**Civ. A. No. 85–894.**

United States District Court, D. New Jersey.

June 28, 1985.

Samuel R. DeLuca, Jersey City, N.J. (by Donald R. Venezia, Jersey City, N.J.), for plaintiff.

Zucker, Facher & Zucker, West Orange, N.J. (by William H. Johnson, III, West Orange, N.J.), for defendant N.J. Sports & Exposition Authority.

## OPINION

SAROKIN, District Judge.

Plaintiff Anthony DeSantis brings this action against the New Jersey Sports and Exposition Authority ("the Authority") and certain of its security guards pursuant to 42 U.S.C. § 1983, and various state tort theories. In particular, plaintiff alleges that, on January 21, 1984, he went to the Byrne Meadowlands Arena, owned and operated by the Authority, for purposes of attending a basketball game. Upon entry, plaintiff inquired as to where he could obtain a drinking mug, which was advertised as a promotional give-away free to patrons of the Arena that evening. Plaintiff was told that all such mugs had already been given away. Perplexed, plaintiff asked to speak to someone in charge.

According to plaintiff, various Arena security guards, who are defendants herein, responded to this complaint by beating plaintiff, handcuffing him and ultimately filing a criminal complaint against him, for creating a disturbance. *See* Complaint,

Exh. A. Such complaint was dismissed on February 8, 1984 for failure to prosecute. On February 22, 1985, plaintiff filed the instant Complaint, alleging violations of his constitutional rights, as well as malicious abuse of process, false arrest, assault and battery, false imprisonment, malicious prosecution and negligence. Defendant now moves to dismiss for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), arguing that the eleventh amendment bars the prosecution of plaintiff's claim in federal court.

The eleventh amendment to the Constitution of the United States provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Such amendment was added after the Supreme Court decision in *Chisholm v. Georgia,* 2 Dall. 419, 1 L.Ed. 440 (1793), allowing a citizen of South Carolina to sue the State of Georgia in federal court.

The decision "created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted." *Monaco v. Mississippi,* 292 U.S. 313, 325 [54 S.Ct. 745, 749, 78 L.Ed. 1282] (1934).

\*　　\*　　\*　　\*　　\*　　\*

The Amendment's language overruled the particular result in *Chisolm,* but [the Supreme] Court has recognized that its greater significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Article III. Thus, in *Hans v. Louisiana,* 134 U.S. 1 [10 S.Ct. 504, 33 L.Ed. 842] (1890), the Court held that, despite the limited terms of the Eleventh Amendment, a federal court could not entertain a suit brought by a citizen against his own State. After reviewing the constitutional debates concerning the scope of Art. III, the Court determined that federal jurisdiction against unconsenting States "was not contemplated by the Constitution when establishing the

judicial power of the United States." *Id.* at 15 [10 S.Ct. at 507]. *See Monaco v. Mississippi, supra,* 292 U.S. at 322–23 [54 S.Ct. at 747–48].

*Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984) (footnote omitted).

Here, the issue presented is whether the Authority is to be deemed the State for eleventh amendment purposes. The Court of Appeals for the Third Circuit has listed the following as the criteria to be applied in deciding such issue.

> Local law and decisions defining the status and nature of the agency involved in its relation to the sovereign are to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's actions.

*Blake v. Kline,* 612 F.2d 718, 722 (3d Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980), quoting *Urbano v. Board of Managers of New Jersey State Prisons,* 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970). *See also Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 302 (6th Cir.1984); *Fouche v. Jekyll Island—State Park Authority,* 713 F.2d 1518, 1520 (11th Cir.1983), citing *Mt. Healthy City School District Board of*

*Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) ("The issue here ... turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, upon the nature of the entity created by state law."). The court here endeavors to apply such criteria, essentially without the assistance of the parties, whose cursory submissions do not do justice to this important issue of first impressions.

By way of background, the Authority was created by the New Jersey Sports and Exposition Authority Law, enacted in 1971. N.J.Stat.Ann. 5:10–1 *et seq.* ("the Law"). The purposes of the Authority are spelled out in the Law, and include "the general welfare, health and prosperity of the people of the State," the provision of recreation, forums and expositions for the public, the promotion of industry, and the "needed development of [the] meadowlands." N.J. Stat.Ann. 5:10–2. The Law describes the Authority as "an instrumentality of the State exercising public and essential governmental functions" such that its activities "shall be deemed and held to be an essential governmental function of the State." N.J.Stat.Ann. 5:10–4(a). Its revenues are "deemed and held to be applied in support of government." *Ibid.*

The Authority consists of the State Treasurer, the Attorney General, and a member of the Hackensack Meadowlands Development Commission to be selected by the Governor, all members *ex officio,* plus six members appointed by the Governor for four-year terms, with the advice and consent of the State Senate. N.J.Stat.Ann. 5:10–4(b).[1] The Governor also appoints the chairman of the Authority, N.J.Stat.Ann. 5:10–4(d), and may remove or suspend Authority members, N.J.Stat.Ann. 5:10–4(c),

---

1. Members are required to take an oath of office and execute performance bonds. N.J.Stat.

Ann. 5:10–4(c), (e). They are not, however, compensated. N.J.Stat.Ann. 5:10–4(f).

and even veto their actions. N.J.Stat.Ann. 5:10–4(i). Additionally,

> The authority may be dissolved by act of the Legislature on condition that the authority has no debts or obligations outstanding or that provision has been made for the payment or retirement of such debts or obligations. Upon any such dissolution of the authority all property, funds and assets thereof shall be vested in the State.

N.J.Stat.Ann. 5:10–4(h).

The Authority may sue and be sued, lease property, borrow money, enter into contracts, make bylaws, rules and regulations, etc. N.J.Stat.Ann. 5:10–5. *See also* N.J.Stat.Ann. 5:10–11 (covenants to secure payment). The revenues realized by the Authority are to be utilized in accordance with statute: first, for operation and maintenance; second, to repay outstanding obligations; third, to make repairs and improvements; fourth, to make certain payments in lieu of taxes to the municipality in which its property is located; fifth, to pay additional amounts to compensate such municipality for any tax revenue lost as a result of lands acquired by the Authority; and sixth, the balance is to be deposited in the General State Fund, for use as a debt service to repurchase outstanding bonds, *see* N.J.Stat.Ann. 5:10–14.1, or for expenditures by the Meadowlands Commission pursuant to N.J.Stat.Ann. 13:1B–13 *et seq.*, 13:17–1 *et seq. See generally* N.J.Stat. Ann. 5:10–6(b).

The Authority is authorized to issue bonds "in such principal amounts as in the opinion of the authority shall be necessary to provide sufficient funds for any of its corporate purposes." N.J.Stat.Ann. 5:10–10(a). Except where guaranteed by the State, pursuant to referendum, the issuance of such bonds does not require State approval, and does not give rise to any liability on the part of the State. N.J. Stat.Ann. 5:10–10(f)–(g). Nor, absent such authorization, may the Authority otherwise incur indebtedness or liability on behalf of or payable by the State. N.J.Stat.Ann. 5:10–10(h). It may, however, contract to relocate public highways, N.J.Stat.Ann. 5:10–8, and may exercise the power of eminent domain. N.J.Stat.Ann. 5:10–9. The State, in turn, has promised not to alter or interfere with the obligations incurred by the Authority. N.J.Stat.Ann. 5:10–15.

The Authority's actions are, additionally, highly regulated by the State. Thus, for example, annual reports are required, N.J. Stat.Ann. 5:10–19, public bidding mandated, N.J.Stat.Ann. 5:10–21.1–21.6, the size of the Meadowlands complex limited, N.J.Stat. Ann. 5:10–22, and environmental factors considered in running the complex. N.J. Stat.Ann. 5:10–23. In return, the Authority is exempt from state and local taxes, though it may enter into agreements to pay them. N.J.Stat.Ann. 5:10–18.

Application of the *Blake v. Kline* factors to the Authority yields the following conclusions. First, local law regarding the authority is clear and straightforward: in 1972, the Supreme Court of New Jersey upheld the constitutionality of the Law, and discussed it at some length. *New Jersey Sports & Exposition Authority v. McCrane*, 61 N.J. 1, 292 A.2d 545 (1972), *appeal dismissed*, 414 U.S. 991, 94 S.Ct. 343, 38 L.Ed.2d 230 (1973). For example, the Court held that "it was well within the discretion of the Legislature to find that the sports and exposition complex as described and authorized in the statute is a public project and serves a public purpose." 61 N.J. at 15–16, 292 A.2d 545. *See also Id.* at 23, 292 A.2d 545. It thus agreed that the Authority's role is governmental, rather than proprietary, in nature. The Court also construed the statute to hold that the debts of the Authority are not liabilities of the State, 61 N.J. at 16–17, 292 A.2d 545, that it is not dependent upon the Legislature for appropriations, 61 N.J. at 21–22, 292 A.2d 545, and that it is likely to produce substantial revenues, some of which will go to the State treasury. 61 N.J. at 24, 292 A.2d 545.[2]

---

**2.** The *McCrane* Court appeared, ultimately, to characterize the Authority as "an independent autonomous authority or agency" with which the State essentially contracts to perform cer-

*See also Horsemen's Benevolent and Protective Association v. Atlantic City Racing Association,* 98 N.J. 445, 455, 487 A.2d 707 (1985) (the Law does not involve direct or indirect public expenditures).

Additionally, it now appears that the Authority is immune from suit under the New Jersey Tort Claims Act, N.J.Stat.Ann. 59:1–1 *et seq.* Thus, in *Rodriguez v. New Jersey Sports & Exposition Authority,* 193 N.J.Super. 39, 472 A.2d 146 (App.Div. 1983), *certif. den.,* 96 N.J. 291, 475 A.2d 586 (1984), the court assumed the Authority to be a "public entity" and held that it was immune, pursuant to the provisions of the Act, for the criminal assault and robbery of a patron allegedly due to the failure to provide adequate and effective security. 193 N.J.Super. at 42–44, 472 A.2d 146.[3]

Courts have not otherwise discussed the Law in any general way, focusing instead on particular problems that have arisen, regarding, for example, bidding, *see Autotote Ltd. v. New Jersey Sports & Exposition Authority,* 85 N.J. 363, 427 A.2d 55 (1981), horse racing, *see Township of Cherry Hill v. New Jersey Racing Commission,* 131 N.J.Super. 125, 328 A.2d 653 (L.Div.), *aff'd,* 131 N.J.Super. 482, 330 A.2d 600 (App.Div.1974), or the environment. *See Wullamey v. Werblin,* 364 F.Supp. 237 (D.N.J.1973); *In re Sports Complex Hackensack Meadowlands,* 62 N.J. 248, 300 A.2d 337 (1973), *cert. denied,* 414 U.S. 989, 94 S.Ct. 291, 38 L.Ed.2d 228 (1973). Though not to be characterized as "local law," also illuminating is the decision of the Third Circuit in *International Society for Krishna Consciousness v. New Jersey Sports and Exposition Authority,* 691 F.2d 155 (3d Cir.1982). There, the court held that, while the Meadowlands Sports Complex was an instrumentality of the State, and thus, that it may engage in state action within the meaning of section 1983, 691 F.2d at 159, nonetheless, it was not a "public forum" for first amendment purposes. Interestingly, the court wrote:

> ... the Meadowlands is a commercial venture by the state. It is designed to bring economic benefits to northern New Jersey, and is expected to generate at least enough revenue to meet its current expenses and debt service. It earns money by attracting and entertaining spectators with athletic events and horse races. The complex is not intended to be a public forum....

> Although the sports complex is not a public forum, it is owned and operated by the state. The government's obligation to observe the Constitution does not cease when it is acting in a proprietary capacity....

691 F.2d at 161.

These decisions create the framework for the *Blake v. Kline* analysis. Certainly, they do not determine the outcome of such

---

tain governmental functions. 61 N.J. at 14, 292 A.2d 545.

**3.** The Authority's coverage under the New Jersey Tort Claims Act is but one consideration in determining to what extent the Authority should be adjudged the alter ego of the State. In *Gibson-Homans Co. v. New Jersey Transit Corp.,* 560 F.Supp. 110 (D.N.J.1982), Judge Stern of this court canvassed other statutory schemes pertinent to this inquiry, there finding New Jersey Transit to be subject to the terms of the New Jersey Contractual Liability Act, N.J.Stat.Ann. 59:13–1 *et seq., cited in* N.J.Stat.Ann. 27:25–19, the New Jersey Employer-Employee Relations Act, N.J.Stat.Ann. 34:13A–1 *et seq.,* cited in N.J. Stat.Ann. 27:25–14(c), the State Expenditures Limitation Act, N.J.Stat.Ann. 52:9H–5 *et seq., cited in* N.J.Stat.Ann. 27:25–14(c), and the New Jersey Open Public Meetings Act, N.J.Stat.Ann. 10:4–6 *et seq., cited in* N.J.Stat.Ann. 27:25–4(g),

and that its funds are deposited in the New Jersey Cash Management Fund. N.J.Stat.Ann. 52:18A–90.4. Based in part upon these findings, Judge Stern held New Jersey Transit to be the alter ego of the State, for diversity and eleventh amendment purposes. 560 F.Supp. at 114. For the reasons set forth below, the court here finds the opposite with respect to the New Jersey Sports and Exposition Authority. However, it notes that the parties—and particularly the moving party—have not cited any of these statutes for purposes of this motion, with the exception of the state Tort Claims Act. Unlike the statute creating the New Jersey Transit Corporation, the Law does not explicitly incorporate these statutes into its text. Should the parties so wish, the court will, of course, entertain a motion for reconsideration based upon these statutes, should they be shown to apply.

analysis. Indeed, the decisions reveal the ambivalent nature of the Authority—a "public project [for] a public purpose," *McCrane, supra,* 61 N.J. at 16, 292 A.2d 545, but "acting in a proprietary capacity," *International Society, supra,* 691 F.2d at 161, independent of the public fisc in that it does not create liabilities therefor or draw appropriations therefrom, *Horsemen's Benevolent and Protective Association, supra,* 98 N.J. at 455, 487 A.2d 707; *McCrane, supra,* 61 N.J. at 21–22, 292 A.2d 545, yet bound to disgorge any profits to the State. *Id.* at 24, 292 A.2d 545. Nor finally is the Authority's partial immunity [4] under the New Jersey Tort Claims Act dispositive of its eleventh amendment defense, although it is an indication that local courts consider the Authority a public entity for at least some purposes. *But see infra* at 421–422.

The other pertinent factors, the court believes, militate against a finding that the Authority is an alter ego of the State. First, and perhaps most importantly, see *Blake v. Kline, supra,* 612 F.2d at 723 ("The most important factor in the determination of the eleventh amendment immunity is whether judgment will have to be paid from the state treasury"), citing *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *see generally Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974), in the event plaintiff prevails, the payment of the judgment will not *have* to be made out of the state treasury. Indeed, the Law is clear: the Authority cannot incur liability on the part of the State. *See* N.J.Stat.Ann. 5:10–10(f)–(h). Of course, as defendant argues, to the extent that such liability diminishes the surplus earned by the Authority, it indirectly comes from proceeds that would otherwise go to the State treasury. *See* N.J.Stat. Ann. 5:10–6(b)(6). However, this argument proves too much and could lead to the conclusion that any expenditure of money by anyone, to the extent that it diminishes

his or her tax liability, is an expenditure of the State. In fact, the Authority is self-sustaining, *see McCrane, supra,* 61 N.J. at 10, 292 A.2d 545, and any legal liabilities which it incurs must be paid out of its own revenues. Nor may plaintiff, by virtue of this lawsuit, obtain a judgment against the State. Hence, the first prong of the test argues strongly against the eleventh amendment bar here set up by defendant.

Second, as the Court of Appeals for the Third Circuit held, notwithstanding the clear governmental interest that is furthered by the Authority, and the constant invocation of that interest by the Legislature, *see* N.J.Stat.Ann. 5:10–2, 5:10–4(a), and courts of New Jersey, *see McCrane, supra,* 61 N.J. at 15–16, 23, 292 A.2d 545, the Authority exercises an essentially proprietary function. *See International Society, supra,* 691 F.2d at 161. *See also Morrison-Knudsen Co. Massachusetts Bay Transportation Authority,* 573 F.Supp. 698, 704 (D.Mass.1983) (court holds that Authority functions in proprietary fashion, notwithstanding state court decision to the contrary). It is self-sustaining and requires no governmental subsidies, though it may yield a profit, for the benefit of the State. Moreover, the activity in which the Authority engages, selling tickets—at market value—in exchange for providing entertainment, or creating facilities for gambling, is the type of activity generally engaged in by private enterprise. The court thus concludes that the second prong of the *Blake v. Kline* test favors plaintiff for purposes of the instant motion.

Third, the parties do not discuss whether the Authority has been separately incorporated. It appears that it has not: though "established in the Department of Community Affairs" as "a body corporate and politic, with corporate succession," N.J. Stat.Ann. 5:10–4(a), and possessed of many prototypically corporate powers, *see, e.g.,* N.J.Stat.Ann. 5:10–5(c) (power to make and alter bylaws), the Authority is nonetheless

---

**4.** As *Rodriguez* makes clear, the Authority's immunity in that case was based upon "the specific immunit[y] granted public entities ... from lia-

bility for injuries and damages from the failure to provide police protection...." 193 N.J.Super. at 42, 472 A.2d 146.

described as "an instrumentality of the State." Hence, for purposes of this motion, the court assumes that the Authority is not separately incorporated. It does not, however, consider such fact to be particularly significant.

Fourth, and perhaps most difficult of resolution, is the question of the Authority's autonomy. Such question is shrouded in the confusion caused by the Law. On the one hand, such Law allows the Governor to appoint, and to terminate the appointments of, all members of the Authority, and even to veto the Authority's actions. *But see New Jersey Turnpike Authority v. Parsons,* 3 N.J. 235, 243, 69 A.2d 875 ("The fact that the members of the Turnpike Authority are appointed by the Governor with the advice and consent of the Senate rather than elected by the voters in nowise alters the status of the Turnpike Authority as an independent corporate entity any more than does the similar appointment of members of the Port of New York Authority, or members of the Interstate Sanitation Commission.") (citations omitted). Moreover, the State Treasurer and Attorney General sit on the Authority as members *ex officio.* Similarly, the Authority functions in a highly regulated setting: everything from the way in which it spends its revenues, N.J.Stat.Ann. 5:10–6(b), to its capacity for growth, *see* N.J. Stat.Ann. 5:10–22, are limited by State statute. On the other hand, the Authority is authorized to exercise a great deal of independent corporate action, *see* N.J.Stat.Ann. 5:10–5, 5:10–11, including raising funds by issuing bonds, *see* N.J.Stat.Ann. 5:10–10, action with which the State cannot, by statute, interfere. N.J.Stat.Ann. 5:10–15. *See McCrane, supra,* 61 N.J. at 12, 292 A.2d 545. Hence, the applicable Law reveals an Authority which, while subject to strict controls, appears to operate with a great deal of autonomy. *See Id.* at 14, 292 A.2d 545. Nor does defendant set forth facts to

the contrary.[5] In combination with the Authority's fiscal autonomy, discussed *supra,* this autonomy leads the court to conclude that this factor too militates against a finding that the Authority is the alter ego of the State for eleventh amendment purposes.

Fifth, it is clear that the Authority has the capacity to sue and be sued and to enter into contracts, although its capacity to be sued, at least under the New Jersey Tort Claims Act, is limited by virtue of the *Rodriguez* decision. *See supra* at 420 and n. 4. That decision certainly supports the contentions of defendant. Taken alone, however, it does not render the Authority immune from suit in the federal courts. Thus, for example, the Tort Claims Act, by its terms, applies to municipalities, *see* N.J. Stat.Ann. 59:1–3 (definition of "public entity," including "municipality" and "public authority"); however, the United States Supreme Court has made clear that municipalities are not alter egos of the State for eleventh amendment purposes. *See, e.g., Mt. Healthy City Board of Education v. Doyle, supra,* 429 U.S. at 280, 97 S.Ct. at 572 (citing cases). *See also Sixth Camden Corp. v. Township of Evesham, County of Burlington,* 420 F.Supp. 709, 717–18 (D.N.J.1976), citing *S.J. Groves & Son Co. v. New Jersey Turnpike Authority,* 268 F.Supp. 568, 574 (D.N.J.1967). Thus, the New Jersey Tort Claims Act cannot be dispositive of the jurisdictional questions here presented. In light of the other considerations discussed herein, the court finds the Authority liable to suit in federal court notwithstanding the holding of *Rodriguez.*

Sixth, is the fact that Authority property is immune from State taxation. *See* N.J. Stat.Ann. 5:10–18. However, the court does not find this fact to be dispositive in light of all of the above.

---

**5.** Defendant may wish to adduce facts beyond the face of the statute to support its claim of eleventh amendment immunity. *Blake v. Kline, supra,* 612 F.2d at 726. By denying this motion, the court acts on the basis of the record before it. As with all motions to dismiss for lack of subject matter jurisdiction, such denial is therefore without prejudice. *See* Fed.R.Civ.P. 12(h)(3).

Finally, it is also correct that the State has immunized itself from liability for the actions of the Authority. *See* N.J.Stat. Ann. 5:10–10(f)–(h). This, of course, supports the court's conclusion that eleventh amendment immunity is not properly invoked in this case.

In sum, application of the *Blake v. Kline* factors to this case leaves the court persuaded that defendant's motion to dismiss must be denied. The financial independence of the Authority, *see supra* at 420, the proprietary nature of its function, *see supra* at 420, its statutorily mandated autonomy to act as do other corporations, *see supra* at 421, the fact that it may sue or be sued, *see supra* at 421–22, and that it may not create liability for the State, *see supra* at 422, all point toward the existence of an entity independent of, if related to, the State; these factors outweigh those other factors, including those not explicitly discussed herein, such as the Authority's eminent domain power, *but compare Morrison-Knudsen, supra*, 573 F.Supp. at 704 (eminent domain power implies autonomy) *with Gibson-Homans, supra*, 560 F.Supp. at 114 (eminent domain power implies state alter ego status), supporting a contrary finding. Nor is the pertinent caselaw to the contrary. Thus, for example, the decision of the court in *Gibson-Homans, supra*, that the New Jersey Transit Corp. had eleventh amendment immunity, was based upon several factors not present here, namely that New Jersey Transit received significant state subsidies, that judgments against New Jersey Transit would result in still greater subsidies and would thus come out of the State treasury, and that New Jersey Transit was generally treated as would any other public state agency, in terms of which statutes would be applied to it. 560 F.Supp. at 114. None of these factors apply in the instant case, although others, such as the Governor's appointment of the Authority, do. 560 F.Supp. at 113. Moreover, in *S.J. Groves & Sons, supra*, the court came to a conclusion in accord with that reached here, regarding the New Jersey Turnpike Authority, holding that

... New Jersey has created a public corporation with substantial fiscal and managerial autonomy and has insulated the State treasury from the Authority's obligations and liabilities. The Authority acquires property, enters contracts and sues on its own behalf, but for organizational purposes it is pigeonholed in the State Highway Department. That it performs an essential governmental function is *not* disputed. Nevertheless, New Jersey courts repeatedly have held that its fortunes were not so closely tied to the State as to make it a mere nominee or alter ego. In light of all these factors, the Authority is not protected by the Eleventh Amendment as a matter of law.

268 F.Supp. at 578 (emphasis in original). Hence, despite the fact that the State expended some monies allocable to the Turnpike Authority, 268 F.Supp. at 576, the court found a statute quite similar to the one here at issue not to give rise to eleventh amendment immunity. *Compare* N.J. Stat.Ann. 5:10–1 *et seq. with* N.J.Stat.Ann. 27:23–1 *et seq.* Nor is either Authority an executive agency as in *Aerated Products Co. v. Department of Health of New Jersey*, 159 F.2d 851, 853–54 (3d Cir.1947).

Cases from other jurisdictions are also in accord, or are readily distinguishable. *See, e.g., Hall v. Medical College of Ohio, supra*, 742 F.2d at 302–07 (state medical school immune from eleventh amendment where it receives substantial state monies, performs a governmental function, does not exercise corporate powers, and lacks autonomy); *Harvey & Harvey, Inc. v. Delaware Solid Waste Authority*, 600 F.Supp. 1369, 1372–74 (D.Del.1985) (Delaware Solid Waste Authority not alter ego of the state despite the fact that it is appointed and monitored by the Governor, where it may raise its own funds and may not incur liability on the part of the State); *Hutchins v. Board of Trustees of Michigan State University*, 595 F.Supp. 862–864–68 (W.D. Mich.1984) (following *Hall* ); *Herer v. Burns*, 577 F.Supp. 762, 763–64 (W.D.Va. 1984) (state hospital alter ego of the State where it is controlled by the State, has its

budget appropriated by the State, cannot sue or be sued, enter into contracts or own property, etc.); *Smith v. New Castle County Vocational-Technical School District,* 574 F.Supp. 813, 817–18 (D.Del.1983) (school district not alter ego of the State, notwithstanding appointment of Board by the State, extensive State regulation, and possibility that State will pay judgments against it); *Morrison-Knudsen, supra,* 573 F.Supp. at 700–05 (Massachusetts Bay Transportation Authority not an arm of the State notwithstanding State's liability to bondholders and subsidization of Authority, where Authority has significant autonomy and acts in a proprietary capacity). For these reasons, defendant's motion to dismiss must be denied. An appropriate order will issue.